## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

|  |  |
|---|---|
| **JOHN DOE** | \* **CIVIL ACTION 19-13374** |
| **VERSUS** | \* |
| **CEPHALON, INC.; TEVA PHARMACEUTICAL INDUSTRIES, LTD.; TEVA PHARMACEUTICALS USA, INC.; TEVA, LTD; JANSSEN PHARMACEUTICALS, INC.; JOHNSON & JOHNSON; ORTHO-MCNEIL-JANSSEN PHARMACEUTICA INC.; JANSSEN PHARMACEUTICA, INC.; ENDO HEALTH SOLUTIONS, INC.; ENDO PHARMACEUTICALS, INC.; QUALITEST PHARMACEUTICALS, INC.; ALLERGAN PLC; ACTAVIS PLC; WATSON PHARMACEUTICALS, INC.; ACTAVIS, INC., WATSON LABORATORIES, INC.; ACTAVIS PHARMA, INC., WATSON PHARMA, INC., AND ACTAVIS, LLC** | \* **JUDGE** |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## CLASS ACTION COMPLAINT

Plaintiff JOHN DOE, a person of the full age of majority and resident/citizen of the State

of North Carolina (who purchased defendants' opioids in Louisiana) who individually, and, on

behalf of all other similarly situated persons, files this Class Action Complaint.

**A.    DEFENDANTS:**

**1.**

CEPHALON, INC., is a Delaware corporation with its principal place of business in

Frazer, Pennsylvania.   TEVA PHARMACEUTICAL INDUSTRIES, LTD. ("Teva Ltd."), is an

Israeli corporation with its principal place of business in Petah Tikva, Israel. In 2011, Teva

Ltd., acquired Cephalon, Inc. TEVA PHARMACEUTICALS USA, INC. ("Teva USA"), is a

wholly-owned subsidiary of Teva Ltd., and is a Delaware corporation with its principal place of

business in Pennsylvania. Teva USA acquired Cephalon, Inc., in October 2011.

**2.**

Cephalon, Inc., manufactures, promotes, sells, and distributes opioids such as Actiq and

Fentora in the United States and Louisiana. Actiq and Fentora have been approved by the FDA

only for the "management of breakthrough cancer pain in patients 16 years of age and older who

are already receiving and who are tolerant to opioid therapy for their underlying persistent cancer

pain."[1] In 2008, Cephalon, Inc., pled guilty to a criminal violation of the Federal Food, Drug and

Cosmetic Act for its misleading promotion of Actiq and two (2) other drugs and agreed to pay

$425 million.

**3.**

Teva Ltd., Teva USA, and Cephalon, Inc., work together closely to market and sell

Cephalon, Inc., products in the United States. Teva Ltd., conducts all sales and marketing

activities for Cephalon, Inc., in the United States through Teva USA and has done so since its

October 2011 acquisition of Cephalon, Inc. Teva Ltd., and Teva USA hold out Actiq and Fentora

as Teva products to the public. Actiq and Fentora prominently display Teva Ltd.'s logo. Teva

Ltd.'s financial reports list Cephalon, Inc.'s and Teva USA's sales as its own, and its year-end

report for 2012 – the year immediately following the Cephalon, Inc., acquisition – attributed a 22%

increase in its specialty medicine sales to "the inclusion of a full year of Cephalon's specialty

---

[1] Breakthrough pain is a short-term flare of moderate-to-severe pain in patients with otherwise stable persistent pain.

sales." Through interrelated operations like these, Teva Ltd., operates in Louisiana and the rest of the United States through its subsidiaries, Cephalon, Inc. and Teva USA. The United States is the largest of Teva Ltd.'s global markets, representing 53% of its global revenue in 2015, and, were it not for the existence of Teva USA and Cephalon, Inc., Teva Ltd., would conduct those companies' business in the Unites States itself. Upon information and belief, Teva Ltd., directs the business practices of Cephalon, Inc., and Teva USA, and their profits inure to the benefit of Teva Ltd., as controlling shareholder. (Teva Pharmaceutical Industries, Ltd., Teva Pharmaceuticals USA, Inc., and Cephalon, Inc., are herein referred to collectively as "Cephalon.")

**4.**

JANSSEN PHARMACEUTICALS, INC., is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey, and is a wholly-owned subsidiary of JOHNSON & JOHNSON ("J&J"), a New Jersey corporation with its principal place of business in New Brunswick, New Jersey. ORTHO-McNEIL-JANSSEN PHARMACEUTICALS, INC., now known as JANSSEN PHARMACEUTICALS, INC., is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey. JANSSEN PHARMACEUTICA INC., now known as JANSSEN PHARMACEUTICALS, INC., is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey. J&J is the only company that owns more than 10% of Janssen Pharmaceuticals' stock and corresponds with the FDA regarding Janssen's products. Upon information and belief, J&J controls the sale and development of Janssen Pharmaceuticals' drugs, and Janssen's profits inure to J&J's benefits. (Janssen Pharmaceuticals, Inc., Ortho-McNeil-Janssen Pharmaceuticals, Inc., Janssen Pharmaceutica, Inc., and J&J are herein referred to collectively as "Janssen.").

**5.**

Janssen manufactures, promotes, sells, and distributes drugs in the United States and Louisiana, including the opioid Duragesic.   Before 2009, Duragesic accounted for at least $1 billion in annual sales.   Until January 2015, Janssen developed, marketed, and sold the opioids Nucynta and Nucynta ER.   Together, Nucynta and Nucynta ER accounted for $172 million in sales in 2014.

**6.**

ENDO HEALTH SOLUTIONS INC. is a Delaware corporation with its principal place of business in Malvern, Pennsylvania.   ENDO PHARMACEUTICALS INC. is a wholly-owned subsidiary of Endo Health Solutions Inc., and is a Delaware corporation with its principal place of business in Malvern, Pennsylvania.   (Endo Health Solutions Inc. and Endo Pharmaceuticals Inc. are herein referred to as "Endo.")

**7.**

Endo develops, markets, and sells prescription drugs, including the opioids Opana/Opana ER, Percodan, Percocet, and Zydone, in the United States and Louisiana. Opioids made up roughly $403 million of Endo's overall revenues of $3 billion in 2012.Opana ER yielded $1.15 billion in revenue from 2010 and 2013, and it accounted for 10% of Endo's total revenue in 2012.   Endo also manufactures and sells generic opioids such as Oxycodone, Oxymorphone, Hydromorphone, and Hydrocodone products in the United States and Louisiana, by itself and through its subsidiary Qualitest Pharmaceuticals, Inc.

**8.**

ALLERGAN PLC is a public limited company incorporated in Ireland with its principal

place of business in Dublin, Ireland.   ACTAVIS PLC acquired Allergan PLC in March 2015, and

the combined company changed its name to Allergan PLC in January 2013.   Before that,

WATSON PHARMACEUTICALS, INC., acquired ACTAVIS, INC., in October 2012, and the

combined company changed its name to Actavis, Inc., as of January 2013 and then Actavis plc in

October 2013.   WATSON LABORATORIES, INC., is a Nevada corporation with its principal

place of business in Corona, California, and is a wholly-owned subsidiary of Allergan PLC (f/k/a

Actavis, Inc., f/k/a Watson Pharmaceuticals, Inc.).   ACTAVIS PHARMA, INC., (f/k/a Actavis,

Inc.), is a Delaware corporation with its principal place of business in New Jersey and was formerly

known as WATSON PHARMA, INC.   ACTAVIS LLC is a Delaware limited liability company

with its principal place of business in Parsippany, New Jersey.   Each of these Defendants is owned

by Allergan, PLC, which uses them to market and sell its drugs in the United States. Upon

information and belief, Allergan PLC exercises control over these marketing and sales efforts and

profits from the sale of Allergan/Actavis products ultimately inure to its benefit. (Allergan PLC,

Actavis, Inc., Actavis LLC, Actavis Pharma, Inc., Watson Pharmaceuticals, Inc., Watson Pharma,

Inc., and Watson Laboratories, Inc., are herein referred to as "Actavis.")

**9.**

Actavis manufactures, promotes, sells, and distributes opioids, including the branded drugs

Kadian and Norco, a generic version of Kadian, and generic versions of Duragesic and Opana, in

the United States and Louisiana.   Actavis acquired the rights to Kadian and King Pharmaceuticals,

Inc., on December 30, 2008, and began marketing Kadian from King Pharmaceuticals, Inc., on

December 30, 2008, and began marketing Kadian in 2009.

**B.     JURISDICTION AND VENUE:**

**10.**

This Court has jurisdiction pursuant to 28 U.S.C. §1332 as the citizenships of plaintiff and all putative class members are diverse from the citizenship of all defendants based on their residency and principal places of business.

**C.     FACTUAL ALLEGATIONS:**

**11.**

Before the 1990s, generally accepted standards of medical practice dictated that opioids should only be used short-term for acute pain, pain relating to recovery from surgery, or for cancer or palliative (end-of-life) care. Due to the lack of evidence that opioids improved patients' ability to overcome pain and function, coupled with evidence of greater pain complaints as patients developed tolerance to opioids over time and the serious risk of addiction and other side effects, the use of opioids for chronic pain was discouraged or prohibited.   As a result, doctors generally did not prescribe opioids for chronic pain.

**12.**

To take advantage of the lucrative market for chronic pain patients (despite the inappropriateness of their product for long-term use), each Defendant developed a well-funded marketing scheme based on deception.   Each Defendant used both direct marketing and unbranded advertising disseminated by seemingly independent third parties to spread false and deceptive statements about the risks and benefits of long-term opioid use – statements that benefited not only themselves and the third parties who gained legitimacy when Defendants repeated those statements, but also other Defendants and opioid manufacturers.   Yet, these

Page 6

statements were not only unsupported by or contrary to the scientific evidence, they were also contrary to pronouncements by and guidance from the FDA and CDC based on that evidence. They also targeted susceptible prescribers and vulnerable patient populations.

### Defendants used multiple avenues to disseminate their false and deceptive statements about opioids.

### 13.

Defendants spread their false and deceptive statements by marketing their branded opioids directly to doctors and patients in Louisiana.    Defendants also deployed seemingly (and intentionally misrepresented to be) unbiased and independent third parties that they controlled to spread their false and deceptive statements about the risks and benefits of opioids for the treatment of chronic pain throughout the State.

### Defendants spread and continue to spread their false and deceptive statements through direct marketing of their branded opioids.

### 14.

Defendants' direct marketing of opioids generally proceeded on two tracks.  First, each Defendant conducted and continues to conduct advertising campaigns touting the purported benefits of their branded drugs.   For example, opioid manufacturers spent more than $14 million on medical journal advertising of opioids in 2011, nearly triple what they spent in 2001.

### 15.

A number of Defendants' branded ads deceptively portrayed the benefits of opioids for chronic pain.  For example, Endo distributed and made available on its website, opana.com, a pamphlet promoting Opana ER with photographs depicting patients with physically demanding

jobs like construction worker and chef, misleadingly implying that the drug would provide tong-term pain relief and functional improvement.

**16.**

Second, each Defendant promoted the use of opioids for chronic pain through "detailers" – sales representatives who visited individual doctors and medical staff in their offices – and small-group speaker programs.  Defendants have not corrected this misinformation.  Instead, each Defendant devoted and continues to devote massive resources to direct sales contacts with doctors.  In 2014 alone, Defendants spent millions on detailing branded opioids to doctors.   The amount includes $34 million by Janssen, $13 million by Cephalon, $10 million by Endo, and $2 million by Actavis.

**17.**

Defendants' detailers have been reprimanded for their deceptive promotions.   A July 2010 "Dear Doctor" letter mandated by the FDA required Actavis to acknowledge, to the doctors to whom it marketed its drugs, that "[b]etween June 2009 and February 2010, Actavis sales representatives distributed . . . promotional materials that . . . omitted and minimized serious risks associated with [Kadian]," including the risk of "[m]isuse, [a]buse, and [d]iversion of [o]pioids" and, specifically, the risk that "[o]pioid[s] have the potential for being abused and are sought by drug abusers and people with addiction disorders and are subject to criminal diversion."

**18.**

Defendants also identified doctors to serve, for payment, on their speakers' bureaus and to attend programs with speakers and meals paid for by Defendants.   These speaker programs

provided: (1) an incentive for doctors to prescribe a particular opioid (so they might be selected to promote the drug); (2) recognition and compensation for the doctors selected as speakers; and (3) an opportunity to promote the drug through the speaker to his or her peers. These speakers gave the false impression that they were providing unbiased and medically accurate presentations when they were, in fact, presenting a script prepared by Defendants. On information and belief, these presentations conveyed misleading information, omitted material information, and failed to correct Defendants' prior misrepresentations about the risks and benefits of opioids.

**19.**

Defendants' detailing to doctors has been effective. Numerous studies indicate that marketing impacts prescribing habits, with face-to-face detailing having the greatest influence. Even without such studies, Defendants purchase, manipulate, and analyze some of the most sophisticated data available in *any* industry-- data available from IMS Health Holdings, Inc.-- to precisely track the rates of individual prescribing and renewal by individual doctor, which in turn allows them to target, tailor, and monitor the impact of their core messages. Thus, Defendants *know* their detailing to doctors to be effective.

**20.**

Defendants employed the same marketing plans and strategies and deployed the same messages in Louisiana as they did nationwide. Across the pharmaceutical industry, "core message" development is funded and overseen on a national basis by corporate headquarters. This comprehensive approach ensures that Defendants' messages are accurately and consistently delivered across marketing channels – including detailing visits, speaker events, and advertising –

and in each sales territory.   Defendants consider this high level of coordination and uniformity

crucial to successfully marketing their drugs.

**21.**

Defendants ensure marketing consistency nationwide through national and regional sales

representative training; national training of local medical liaisons, the company employees who

respond to physician inquiries; centralized speaker training; single sets of visual aids, speaker slide

decks, and sales training materials; and nationally coordinated advertising.   Defendants' sales

representatives and physician speakers were required to stick to prescribed talking points, sales

messages, and slide decks, and supervisors rode along with them periodically to both check on

their performance and compliance.

**Defendants used a diverse group of seemingly independent
third parties to spread false and deceptive
statements about the risks and benefits of opioids.**

**22.**

Defendants also deceptively marketed opioids in Louisiana through unbranded advertising

– *i.e.*, advertising that promotes opioid use generally but does not name a specific opioid.   This

advertising was ostensibly created and disseminated by independent third parties.    But by funding,

directing, reviewing, editing, and distributing this unbranded advertising, Defendants controlled

the deceptive messages disseminated by these third parties and acted in concert with them to falsely

and misleadingly promote opioids for the treatment of chronic pain. Much as Defendants

controlled the distribution of their "core messages" via their own detailers and speaker programs,

Defendants similarly controlled the distribution of these messages in scientific publications,

treatment guidelines, CMEs, and medical conferences and seminars.   To this end, Defendants

used third-party public relations firms to help control those messages when they originated from third parties.

**23.**

Defendants also marketed through third-party, unbranded advertising to avoid regulatory scrutiny because that advertising is not submitted to and typically is not reviewed by the FDA. Defendants also use third-party, unbranded advertising to give the false appearance that the deceptive messages came from an independent and objective source. Like the tobacco companies, Defendants used third parties that they funded, directed, and controlled to carry out and conceal their scheme to deceive doctors and patients about the risks and benefits of long-term opioid use for chronic pain.

**24.**

Defendants' deceptive, unbranded marketing often contradicted what they said in their branded materials reviewed by the FDA.   For example, Endo's unbranded advertising contradicted its concurrent, branded advertising for Opana ER:

| Pain:   Opioid Therapy (Unbranded) | Opana ER Advertisement (Branded) |
|---|---|
| "People who take opioids **as prescribed usually do not become addicted**." | "All patients treated with opioids require careful monitoring for signs of abuse and addiction, since **use of opioid analgesic products carries the risk of addiction even under appropriate medical use**." |

**Key Opinion Leaders ("KOLs")**

**25.**

Defendants also spoke through a small circle of doctors who, upon information and belief, were selected, funded, and elevated by Defendants because their public positions supported the use of opioids to treat chronic pain.   These doctors became known as "key opinion leaders" or "KOLs."

**26.**

Defendants paid KOLs to serve as consultants or on their advisory boards and to give talks or present CMEs, and their support helped these KOLs become respected industry experts.   As they rose to prominence, these KOLs touted the benefits of opioids to treat chronic pain, repaying Defendants by advancing their marketing goals. KOLs' professional reputations became dependent on continuing to promote a pro-opioid message, even in activities that were not directly funded by Defendants.

**27.**

KOLs have written, consulted on, edited, and lent their names to books and articles, and given speeches and CMEs supportive of chronic opioid therapy. Defendants created opportunities for KOLs to participate in research studies Defendants suggested or chose and then cited and promoted favorable studies or articles by their KOLs.   By contrast, Defendants did not support, acknowledge, or disseminate publications of doctors unsupportive or critical of chronic opioid therapy.

**28.**

Defendants' KOLs also served on committees that developed treatment guidelines that

strongly encourage the use of opioids to treat chronic pain, and on the boards of pro-opioid advocacy groups and professional societies that develop, select, and present CMEs. Defendants were able to direct and exert control over each of these activities through their KOLs. The 2016 CDC Guideline recognizes that treatment guidelines can "change prescribing practices."

**29.**

Pro-opioid doctors are one of the most important avenues that Defendants use to spread their false and deceptive statements about the risks and benefits of long-term opioid use. Defendants know that doctors rely heavily and less critically on their peers for guidance, and KOLs provide the false appearance of unbiased and reliable support for chronic opioid therapy.

**30.**

Thus, even though some of Defendants' KOLs have recently moderated or conceded the lack of evidence for many of the claims they made, those admissions did not reverse the effect of the false and deceptive statements that continue to appear nationwide and throughout the State of Louisiana in Defendants' own marketing as well as treatment guidelines, CMEs and other seminars, scientific articles and research, and other publications available in paper or online.

**31.**

Plaintiff, John Doe (like all members of the Putative Class), was prescribed opioids for chronic pain/long-term use. Opioids are not suitable for chronic pain treatment because of the extreme risk of addiction. Plaintiff and those similarly situated purchased defendants' opioids in Louisiana. The redhibition relief sought by plaintiff, and by members of the Putative Class strictly pertains to opioids purchased, in the State of Louisiana**.**

**Claims are made exclusively under Louisiana law.**

**32.**

Plaintiff, and the members of the Putative Class, make claims that arise exclusively under Louisiana law, specifically Articles 2520, 2524, and 2545 of the Louisiana Civil Code: Redhibition.

**33.**

The propensity of the products manufactured and distributed by Defendants to cause addiction renders those unfit for ordinary use as defined by Article 2545 of the Louisiana Civil Code. Further as a matter of law and fact, defendants – the manufacturers of the opioids – knew of the redhibitory defect. A defect is redhibitory when it renders the thing useless, or its use so inconvenient that it must be presumed that a buyer would not have bought the thing had he known of the defect.

**34.**

The products manufactured by Defendants have redhibitory defects as defined by Article 2520 of the Louisiana Civil Code, and the defects are such that plaintiff would not have (and it is presumed under the law that a buyer would have) bought those had the defect been known.

**35.**

The defects in the products sold and distributed by Defendants existed prior to the delivery of those products to Plaintiffs and members of the Putative Class.

**36.**

Because Defendants knew, as a matter of fact and law, of the existence of the defects but omitted to disclose those, they are in bad faith under the provisions of Louisiana Civil Code Article 2545.  Moreover, because Defendants are manufacturers, they are deemed to know that the products that they sold had redhibitory defects.  Because they are in bad faith, Defendants are liable to Plaintiffs, and members of the Putative Class, for return of the price that was paid for the Defendants' products, with interest from the time that it was paid, for reasonable expenses occasioned by the sale (including treatment for the resultant addiction), for expenses, costs, and for reasonable attorneys' fees.

**D.     CLASS ACTION ALLEGATIONS:**

**37.**

Plaintiffs seek to maintain this action as a class action under Rule 23(b)(3) of the Federal Rules of Civil Procedure.  The Class consists of all Louisiana residents who purchased opioids manufactured and/or distributed by Defendants in the State of Louisiana within four (4) years of the filing of this Complaint.  The Class does not include Defendants or their officers, directors, agents, or employees.  Excluded from the Class are any persons associated with or related to the Court or its personnel, and those persons who purchased opioids solely while confined in a hospital or similar healthcare facility for acute surgical pain, pain from terminal cancer, for pain from other terminal and debilitating diseases, and for opioids prescribed and purchased for palliative end-of-life care.

**38.**

The Class consists of thousands upon thousands of Putative Class members who purchased Defendants' products in Louisiana.   The National Institute on Drug Abuse states that in 2017, Louisiana providers wrote 89.5 opioid prescriptions for every 100 persons, compared to the average United States rate of 58.7 prescriptions.   The rate was among the top five (5) in the United States in that year.   The members of the class are so numerous that joinder of all members is impracticable. Numerosity exists.

**39.**

Common questions of law and fact exist and predominate among the members of the Putative Class.   There are no choice of laws issues here; the only claims alleged are those arising under the redhibition articles of the Louisiana Civil Code.   Among the common questions of fact is the question of whether Defendants' products were unfit for ordinary use i.e. whether Plaintiff or those similarly situated would have purchased Defendants' products had the true nature of the products been disclosed.

**40.**

The claims of Plaintiff are typical of the claims of all members of the Putative Class, and the is an adequate class representative who has no conflicts which would prevent him from fully representing the interests of the Putative Class.   Further, Plaintiff has retained counsel with significant experience in class action litigation.

**41.**

The common issues set out above predominate over any individual issues of the members of the Putative Class and a class action is a superior method for adjudicating the claims of the

members of the Putative Class. Each Putative Class member who purchased Defendants' products has a relatively small monetary claim. The amount of the claims can be easily ascertained as a dollar amount, and a class action is a superior method for adjudicating the claims of the members of the Putative Class.

## PRAYER

Plaintiff, individually and as representative of the members of the Putative Class, prays for the following:

1.      that this matter be expeditiously certified as a class action, that Plaintiff be confirmed as the representative of the putative class, and that undersigned counsel be appointed immediately as Putative Class counsel, and later appointed as Class counsel;

2.      that this Court enter judgment in favor of Plaintiff and the Class, against Defendants under the facts and legal theories set forth above;

3.      that this Court award redhibitory damages and expenses (to possiby include the expense of addiction treatment) to Plaintiff and the Class;

4.      that this court award attorneys' fees, litigation expenses, costs, and prejudgment interest; and

5.      for all other general and equitable relief.

**WHEREFORE**, Plaintiff prays that Defendants be cited to appear, and, after due proceedings be had, that the Class be certified, that there be judgment in favor of Plaintiff and the members of the Putative Class and against Defendants, for an amount sufficient to compensate Plaintiffs and those similarly situated for the damages and expenses set out above, for attorneys'

fees, for interest, for all costs of this action, and for all other general and equitable relief.

Respectfully submitted,

/s/ Gary J. Gambel

_____

GARY J. GAMBEL (#19864)
MURPHY, ROGERS, SLOSS,
    GAMBEL & TOMPKINS
701 Poydras Street, Suite 400
New Orleans, Louisiana    70139
Telephone:    (504) 523-0400
Facsimile:    (504) 523-5574


JENNIFER N. WILLIS (#14877)
WILLIS & BUCKLEY, APC
3723 Canal Street
New Orleans, Louisiana    70119
Telephone:    (504) 488-6301
Facsimile:    (504) 488-6302

DONALD C. MASSEY (#14177)
1100 Poydras, Suite 3250
Energy Centre
New Orleans, LA   70163
Telephone: (504) 599-5777
Facsimile: (504) 588-9750

ANDRE TOCE (#16769)
THE TOCE LAW FIRM
969 Coolidge St.
Suite 201
Lafayette, LA 70503
Telephone: (337) 233-6818
Facsimile (866) 306-9336

**ATTORNEYS FOR PLAINTIFF**

Page  18

**PLEASE SERVE:**

**All Defendants will be served through the Louisiana Long Arm Statute**